## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN CONNOR, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 14-40163-TSH** |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### March 17, 2016

Hennessy, M.J.

The Plaintiff, John Connor, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying him Disability Insurance Benefits ("DIB"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #17). The Commissioner seeks an order affirming her decision. (Docket #19).

By Order of Reference dated October 6, 2015, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #22), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

For the reasons that follow, I RECOMMEND that Connor's Motion to Reverse (Docket #17) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #19) be ALLOWED.

I.      BACKGROUND

A.      Procedural History

Connor filed an application for DIB on October 6, 2011, alleging that he had been disabled since June 17, 2011.  (Tr. 181).  The application was denied initially and on reconsideration.  (Tr. 65-93).  Following a July 12, 2013 hearing, the ALJ rendered a decision unfavorable to Connor on September 6, 2013.  (Tr. 20-38).

The ALJ found that Connor had not been disabled from June 17, 2011, through the date of the decision.  (Tr. 33).  On September 22, 2014, the Appeals Council denied Connor's request for administrative review, making the ALJ's decision final and ripe for judicial review.  (Tr. 1-5).  Having timely pursued and exhausted his administrative remedies before the Commissioner, Connor filed a complaint in this Court on November 6, 2014, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  Connor filed the motion for reversal or remand on April 20, 2015, (Docket #17), and the Commissioner filed a cross-motion on June 1, 2015, (Docket #19).  On June 14, 2015, Connor filed a reply to the Commissioner's motion.  (Docket #21).

B.      Personal History

At the time that he claims he became disabled, Connor was 47 years old.  (Tr. 181).  Connor is a high school graduate and possesses a driver's license.  (Tr. 45, 200).  He is married and lives with his wife and two daughters.  (Tr. 45).

Between 1989 and the alleged disability onset date of June 17, 2011, Connor worked forty-six hours per week as a foreman at a warehouse distribution center.  (Tr. 200).  As foreman, Connor supervised thirty other employees and oversaw the distribution of health and beauty products to approximately six hundred store locations across ten states.  (Tr. 201).  Connor stated that he stopped working in part due to his conditions, and, in part, because he "was unable to work with

his superior due to strong disagreements." (Tr. 199). Connor indicated that "[h]is boss is married to [Connor's] ex-wife and this only served to exasperate [Connor's] mental conditions." (Id.).

## C.    Medical History

As of August 24, 2010, Connor was being treated for borderline diabetes mellitus. (Tr. 315). At that time, treating physician Dr. Guarnieri approved Connor's request to be prescribed Lyrica for his neuropathic pain. (Tr. 315-16).

On June 19, 2011, Connor was hospitalized following a suicide attempt culminated by "several stressors building over the years." (Tr. 272-76, 292). He reported feeling depressed for years, increasing over time, as well as feelings of helplessness and worthlessness. (Tr. 273). He also experienced decreased energy, decreased sleep, and anhedonia. (Id.). Connor was discharged from the hospital on June 28, 2011. (Tr. 271).

Connor began regular psychiatric treatment on June 29, 2011 with licensed mental health counselor Leveille. (Tr. 887-90). His diagnoses included major depressive disorder and he was assigned an initial Global Assessment of Functioning ("GAF") score of 45.[1] (Tr. 889).

On July 7, 2011, Connor told nurse practitioner Sergeant that he was "feeling much better and is sleeping well" after he stopped working but still had a depressed mood. (Tr. 797). Connor reported symptoms of pain, weakness, atrophy, abnormal gait, decreased coordination, paresthesias, numbness, tingling, anxiety, memory problems, and altered concentration. (Id.). A physical exam revealed tenderness to palpation in the thoracic and lumbosacral spine, decreased range of motion, and a positive straight leg raise. (Id.). Sergeant added an antidepressant and told Connor to exercise daily, meditate, and maintain a healthy diet. (Tr. 798). On July 21, 2011,

---

[1] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000). A GAF score of 41 to 50 indicates serious symptoms or any serious impairment of social or occupational functioning. Id.

Connor reported to Sergeant that his depression had taken a milder form and that he felt in control of his mood. (Tr. 795). He also reported numbness in both thighs. (Id.).

In August of 2011, an electromyography confirmed evidence of polyneuropathy and right median mononeuropathy indicating carpal tunnel syndrome. (Tr. 327). An MRI taken later that month revealed "very mild degenerative changes," with a "shallow broad-based disc protrusion" at L4-L5, "with no significant spinal canal, lateral recess or neural foraminal compromise." (Tr. 686). On September 22, 2011, Connor complained to Sergeant of pain in his lower extremities, in response to which Sergeant prescribed him Nucynta. (Tr. 790).

On October 6, 2011 at a follow-up appointment with Sergeant, Connor reported that his depression seemed worse. (Tr. 789). At an appointment with counselor Leveille on October 19, 2011, Connor reported that he had "a difficult time leaving his house, because he is afraid something bad is going to happen." (Tr. 880). On November 9, 2011, Connor reported to Leveille that he felt frustrated that he was not showing improvement mentally, and felt overwhelmed, had difficulty leaving his home, was not sleeping, and had poor concentration. (Tr. 879). Connor indicated that the medications he had been prescribed were not working. (Id.). Sergeant had adjusted Connor's psychiatric medication several times between July and October 2011. (Tr. 787-96).

In November 2011, Dr. Breen assessed Connor with "some element of peripheral neuropathy" and "a moderately significant carpal tunnel syndrome bilaterally." (Tr. 651). Dr. Breen informed Connor that his treatment options included surgical decompression or a corticosteroid injection. (Id.). Connor opted for a relatively noninvasive treatment at first which Dr. Breen thought was reasonable. (Id.). Dr. Breen administered an injection in Connor's left carpal tunnel on November 22, 2011. (Id.). On December 13, 2011, Dr. Breen noted that

"[Connor] did very well after the injection and says that he does have decreased pain and numbness and some increased grip strength on that side.  He does report that he continues to have pain and numbness on that side and this has been improved after the injections."  (Tr. 645).  Connor elected to have an injection in his right carpal tunnel on that date.  (Id.).

On December 14, 2011, Connor was examined by nurse practitioner Loretz for a vascular evaluation.  (Tr. 642-44).  Noting that he was overweight, Loretz assessed Connor with "adequate arterial circulation with no evidence of peripheral arterial disease" as well as asymptomatic abnormalities of the veins in Connor's legs.  (Tr. 643).  Loretz also observed distal forefoot neuropathy which she suspected could be related to diabetes mellitus.  (Id.).  Loretz prescribed knee-high compression stockings.  (Id.).

In December 2011, Sergeant offered opinions concerning Connor's physical and mental RFC.  (Tr. 817-25).  Sergeant opined that Connor's pain and other symptoms would interfere constantly with the attention and concentration required to perform even simple work tasks and that he was only capable of low stress jobs.  (Tr. 818).  Sergeant further opined that Connor could walk one city block without rest or severe pain, had significant limitations with reaching, handling, or fingering, could sit for no longer than thirty minutes and stand no longer than fifteen minutes, could sit and stand/walk for about two hours in an eight-hour work day, would need a job that permits shifting positions at will from sitting, standing, or walking, and would need to take unscheduled breaks every thirty minutes lasting five minutes.  (Tr. 818-19).  Sergeant concluded that Connor would likely be absent from work more than four days per month.  (Tr. 820, 824).  Sergeant stated that the assessed symptoms and limitations applied beginning in 2005.  (Tr. 820, 825).

Later that month, Connor underwent a one-time consultative examination with psychologist Dr. Kissin. (Tr. 627-34). Connor received a score of thirty out of thirty points on the Mini-Mental Status Exam, "evidencing no notable deficits in his gross cognitive skills." (Tr. 631). Dr. Kissin stated that Connor's presentation "was appropriate to content without visible distress," "[h]is attention and concentration were grossly intact," and "his thought process was coherent, goal directed and reality-based." (Tr. 630-31). Dr. Kissin did note that Connor reported feeling anxious and depressed and nervous about potential harm from others. (Tr. 630). Dr. Kissin found that, in light of his poor response to medications taken to date, Connor's psychiatric medications may require adjustment "in order to effect optimal mood stabilization." (Tr. 631-32). Dr. Kissin assigned Connor a GAF score of 65.[2] (Tr. 631).

On January 11, 2012, Connor was seen by Dr. Rade at the UMass Memorial Cardiovascular Clinic. (Tr. 639-40). Dr. Rade reported that Connor was doing "extremely well" and had no further symptoms of head or neck discomfort following an increase of his metroprolol dose. (Tr. 639). While noting some trace pedal edema, Dr. Rade concluded that Connor was "Currently asymptomatic from a cardiovascular standpoint." (Tr. 640).

At a February 2, 2012 appointment with Sergeant, Connor rated his back pain at a six to seven out of ten with Percocet. (Tr. 777). Later that month, he stated that his back pain was a seven out of ten and that he still feels "blue." (Tr. 775). On March 17, 2012, Sergeant assigned Connor a GAF of 70 noting that he had a flat affect, had difficulty staying on task if the task was complex, was able to travel, got along well with others, did chores at home, and had a fair prognosis. (Tr. 799-801). On March 22, 2012, Leveille assigned Connor a GAF of 45, observing

---

[2] A GAF score between 61 and 70 denotes "some mild" symptoms or functional limitations, "but generally functioning pretty well." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

that Connor experienced depression, difficulty leaving his home even to go outside, difficulty concentrating, did not complete chores, and was forgetful, withdrawn, and lacked motivation. (Tr. 804-05).

On May 10, 2012, Connor related to Sergeant that he was severely depressed. (Tr. 846). When asked about suicide intentions, Connor stated that he had no plan, however, he "wants the pain to go away, it would if he was dead." (Id.). Connor reported his back pain as a ten out of ten, and numbness in his legs. (Id.). Connor's medication was once again adjusted. (Tr. 847). On June 7, 2012, Connor reported that he felt stable and his pain level was a four out of ten. (Tr. 842). Connor indicated that he had not been taking his Percocet and had stopped refilling his prescription. (Id.).

On June 21, 2012, neurologist Dr. Sundar performed an hour-long examination of Connor. (856-59). Connor related to Dr. Sundar that a feeling of hand numbness had gotten worse in the past year, and that stabbing pain and cramping persisted in all four extremities despite treatment with Lyrica. (Tr. 856). Connor further reported that the cortisone injections that were administered in late 2011 did not provide "any significant relief." (Id.). Dr. Sundar assessed "close to 5/5 strength" in all muscle groups, equal fine finger movements, and mild give-way weakness of the dorsiflexion of the toes, although Connor was able to walk on his toes and heels and perform a tandem gait. (Tr. 857). Dr. Sundar found that "[Connor's] pain appears to be out of proportion to [the] rest of the symptoms." (Tr. 858).

In July of 2012, Connor expressed to Leveille recurring symptoms of depression as well as difficulty leaving his home. (Tr. 873). In August of 2012, Connor complained to Sergeant that he was still experiencing hand and foot numbness. (Tr. 838). At that time, Sergeant observed that Connor had abnormal concentration. (Id.).

Leveille noted Connor "struggles with anxiety [and] depression symptoms in his daily life and family situations" as well as difficulty sleeping due to pain in his hands and feet in December of 2012.  (Tr. 871).  Connor reported to Sergeant on February 7, 2013 that he felt achy and "crampy mentally and physically" and also had arm numbness when he drove.  (Tr. 830).  On February 14, 2013, Connor indicated to Leveille that he "feels tired most of the time."  (Tr. 870).  Connor expressed to Leveille on March 14, 2013 that "he was in a lot of physical pain","  (id.), and, on April 18, 2013, that "his hands, feet, [and] legs are hurting a lot more."  (Tr. 869).

D.     State Agency Opinions

1. Physical

On April 5, 2012, state agency reviewing physician, Dr. McGan, evaluated the record, and opined that Connor can lift/carry ten pounds frequently and twenty pounds occasionally, stand and/or walk for six hours in an eight-hour workday and sit for the same amount of time, is limited to frequent use of foot controls, can occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl, and is limited to occasional handling with the upper right extremity.  (Tr. 86-87).  Dr. McGan also found that Connor should avoid concentrated exposure to extreme cold and heat and to hazards.  (Tr. 87). In making these determinations, Dr. McGan noted that Connor, at six feet tall and 240 pounds, had a BMI of 32 placing him in obesity class 1.[3]

2. Mental

On April 20, 2012, state agency reviewing psychiatrist Dr. Gambill opined that Connor's sustained concentration and persistence constraints limited him to simple one-to-two step tasks. (Tr. 88-90).  He also found that Connor's social interaction limitations allowed him to accept

---

[3] Obesity class 1 is the lowest level of obesity and is not in any way extreme.  Johnson v. Barnhart, 449 F.3d 804, 807 (7th Cir. 2006); Rogers v. Barnhart, 446 F. Supp. 2d 828, 857 (N.D. Ill. 2006)

simple instructions from supervisors, but that he should be limited in his interactions with coworkers.  (Tr. 89).  Dr. Gambill also found that Connor's ability to respond appropriately to changes in the work setting was moderately limited.  (Id.).  Dr. Gambill concluded that Connor could not return to his past job but that he was capable of sustaining simple, repetitive tasks in a low-stress work setting without intense contact with others.  (Id.).

E.      Hearing Testimony

A hearing before an ALJ was held on July 12, 2013, where Connor, represented by an attorney and appearing via videoconference, and a vocational expert gave testimony.  (Tr. 39-64).

Connor testified that he could sit comfortably for ten minutes and stand comfortably for no longer than five minutes.  (Tr. 52-53).  He stated that his typical average normal weight was 250 pounds and his current weight was 259 pounds due to inactivity.  (Tr. 44-45, 53-54).  Connor indicated that he could walk roughly 100 yards and comfortably lift five to ten pounds but had trouble with his grip strength and with picking up small objects.  (Tr. 53).  He stated that he could not lift overhead.  (Tr. 56).  Connor testified that he drives on a weekly basis.  (Tr. 45).  When asked "[w]here do you go if you drive, sir," Connor responded, "[t]o the store, which is close to the house."  (Id.).  Connor testified that if he drove for over ten minutes, his hands would go completely numb and he could not feel himself gripping the steering wheel and would also be unable to feel which pedal he was touching with his foot.  (Tr. 57).  Connor denied driving to doctors' appointments or to the hearing.  (Tr. 45).

Connor described the pain that he experienced as "a burning, itching, stabbing pain feeling with pins and needle numbness in my hands and feet, and a constant ache.  It never goes away." (Tr. 54).  He testified that he also had swelling in both legs from his knees through his ankles.  (Tr. 55).  Connor indicated that his level of pain on a ten point scale was a nine or ten if he took no

medication and was, on average, a seven if he was medicated.  (Tr. 50).  Connor testified that,

between 8:00 a.m. and 5:00 p.m., he spent an average of three hours lying down in order to relieve

swelling and could not go an eight-hour day without lying down.  (Tr. 56).  Connor stated that he

used a wrist splint on both hands and elbow pads in order to help him sleep, which was made

difficult because of the pain and numbness he experiences.  (Tr. 54).  He testified that he slept

about three hours a night and felt fatigued throughout the whole day.  (Tr. 55, 57).

Connor also testified concerning his depression and anxiety.  (Tr. 50).  He stated that he

has feelings of fatigue and guilt and of hopelessness.  (Tr. 51).  He also stated with respect to his

anxiety that "everything scares me basically."  (Id.).  Connor testified that he takes medication for

his anxiety and depression and that he has attended therapy or counseling monthly since July of

2011, after he was discharged from the hospital following a suicide attempt.  (Id.).

Connor testified that he did not cook, do laundry, travel, exercise, or visit relatives and had

no hobbies, but that he was able to bathe and groom and dress himself.[4]  (Tr. 52).  He was also

able to clean off the counter, do light dusting, and sweep, although these activities took him a very

long time to complete.  (Tr. 59).  He indicated that he had panic attacks while in crowds and

avoided them at all costs.  (Tr. 58).  Connor stated that he leaves the house one time a week.  (Id.).

Connor testified that he had trouble concentrating due to the pain.  (Tr. 58-59).

Following Connor's testimony, the ALJ asked a vocational expert for her assessment on

the skill and exertional levels of Connor's work history.  (Tr. 61).  The ALJ asked the vocational

expert to consider:

> a hypothetical individual of [Connor's] age, education and work experience limited
> as follows.  The individual is limited to what Social Security defines as light
> exertional capacity, unskilled in nature, cannot perform at heights, using ladders,
> ropes or scaffolding.  Work should entail no more than occasional and occasional
> means up to one-third of the work day, use of ramps, stairs, stooping, crouching,

---

[4] Connor stated that he did not shower about two times a week due to the difficulty and hassle involved.  (Tr. 57-58).

> crawling and kneeling.  Should not be around dangerous moving machinery or
> should be outside of environments having more than incidental exposure to
> extremes of cold or vibration.  Work should not involve the operation of foot or leg
> controls.  Work should not entail overhead lifting or reaching.  Work should entail
> no more than occasional, occasional being defined as up to one-third of the work
> day, public contact.  Work should not entail more than frequent, frequent being
> defined as up to two-thirds of the work day, grasping, pinching, twisting with the
> hands and arms bilaterally. . . .  Would an individual so limited be able to perform
> [Connor's] past job or other jobs existing in the local or national economies?

(Tr. 61-62).  The vocational expert responded that the hypothetical individual could not perform

past work, but could perform work as a small products assembler consisting of 50,000 jobs

nationally and 400 in Massachusetts, as a price marker consisting of 80,000 jobs nationally and

900 in Massachusetts, and as a sorter consisting of 45,000 jobs nationally and 500 in

Massachusetts.  (Tr. 62).  The vocational expert testified that if the hypothetical individual's

limitations were kept the same but if the exertional capacity was "reduce[d] . . . to sedentary,

allowing for a sit/stand option at will and no more than occasional, occasional being defined as up

to one-third of the work day grasping, pinching, twisting with the hands and arms," the

hypothetical individual "might be able to do work at the sedentary, unskilled level." (Tr. 63).  The

vocational expert also testified that if the hypothetical individual were to miss two or more days

of work every month on a regular basis they would be terminated, and that the jobs listed above

would not be available to the hypothetical individual if he were to be off task twenty percent of

the time.  (Tr. 63).

F.      Administrative Decision

        In assessing Connor's request for benefits, the ALJ conducted the familiar five-step

sequential evaluation process that determines whether an individual is disabled and thus entitled

to benefits.  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d

5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that he is not disabled.  Id.  The ALJ found that Connor had not engaged in substantial gainful activity since June 17, 2011.  (Tr. 25).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."   20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined that Connor had the following severe impairments: "neuropathy, diabetes mellitus, bilateral carpal tunnel syndrome, depressive disorder, and anxiety disorder."  (Tr. 25).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Connor did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 26).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments.  20 C.F.R. § 404.1545(a)(1).  Here, the ALJ found:

[Connor] has the residual functional capacity to perform light work[5] as defined in 20 CFR 404.1567(b). [Connor] must avoid height, ladders, ropes and scaffolds. He is limited to no more than occasional climbing of ramps/stairs, stooping, kneeling, crouching, and crawling. [Connor] is limited to no more than frequent grasping, pinching, and twisting with the hands/arms. He must avoid dangerous moving machinery and operation of foot/leg controls. [Connor] must avoid overhead lifting/reaching, as well as avoid extreme cold and vibrations. [Connor] is limited to unskilled tasks. He is limited to no more than occasional public contact.

(Tr. 27). The ALJ determined that Connor's RFC precluded a return to any past relevant work. (Tr. 31).

At the fifth step, the ALJ asks whether the claimant's impairments prevent him from performing other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ determined that, based upon his RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Connor can perform. (Tr. 32). Accordingly, the ALJ found that Connor was not disabled at any time from June 17, 2011, through September 6, 2013. (Tr. 33).

II.     STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard.

---

[5] "Light" work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing his RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.   ANALYSIS

A.   Obesity

Connor argues that the ALJ's RFC is flawed as it fails to account for Connor's obesity. (Docket #17-1 at 10).  The Commissioner asserts that this argument is inconsistent with Connor's testimony before the ALJ.  (Docket #20 at 9).  At the administrative hearing, Connor testified that he was affected by neuropathy, diabetes, carpal tunnel syndrome, varicose veins, and hypertension.

(Tr. 47-49).  After describing these ailments, the ALJ asked Connor, "Do you have any other physical problems or issues?"  (Tr. 50).  Connor responded in the negative.  (Id.).  The Commissioner argues that Connor remains bound by this concession.  (Docket #20 at 9).  While Connor concedes that he mistakenly omitted obesity among his list of impairments testified to before the ALJ, he maintains that remand is appropriate as the ALJ's decision failed to acknowledge his long-term obesity and its exacerbating effects in combination with his other impairments.  (Docket #21 at 1-2).

The Social Security Administration requires an ALJ to consider the effects of a claimant's obesity at all stages of the evaluative process, including during the RFC assessment.  See SSR 02-01p.  Obesity, in and of itself, can cause limitations in "exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling," in addition to "postural functions, such as climbing, balance, stooping, and crouching."  Id.  "The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers.  The ability to tolerate extreme heat, humidity, or hazards may also be affected."  Id.  The regulations further emphasize that the combined effects of obesity with other impairments "may be greater" than that which might be expected from the impairments considered separately.  Id.

While the ALJ did not mention obesity in his opinion, the ALJ did afford "significant weight" to the opinion of Dr. McGan.  (Tr. 29).  Dr. McGan's opinion explicitly took obesity into account, classifying Connor's obesity as class 1, the lowest level of obesity which is not in any way extreme.  (Tr. 87-88).  There is ample case law in this Circuit that, when the ALJ relies upon the opinion of a medical expert who has taken the claimant's obesity into consideration, there is no basis for remand even where the ALJ completely fails to discuss obesity.  See, e.g., Newell v. Colvin, No. 12-cv-480-SM, 2014 U.S. Dist. LEXIS 16266, at *16 (D.N.H. Feb. 10, 2014)

(collecting cases); Benitez v. Astrue, No. 11-30021-KPN, 2011 U.S. Dist. LEXIS 148633, at *8-10 (D. Mass. Dec. 20, 2011) (finding that ALJ's failure to discuss claimant's obesity did not require remand where claimant did not mention obesity in his application for benefits and neither he nor his attorney raised the condition during the administrative hearing and where the ALJ relied in part on an assessment completed by a state agency consulting physician which noted the claimant's obesity).

Additionally, although he bears the burden of production and persuasion at steps one through four, Bowen, 482 U.S. at 146 n.5; Vazquez, 683 F.2d at 2, Connor fails to specify how his obesity impaired his ability to work beyond those limitations accounted for in the ALJ's determination.  Connor's generalized assertion that obesity may put him at risk for cardiac problems, (Docket #17-1 at 12), is insufficient to meet his burden.  See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (holding that remand is not required where plaintiff has not shown how obesity would affect the analysis undertaken by the ALJ); Durant-Irizarry v. Comm'r of Soc. Sec., No. 14-1444 (MEL), 2015 U.S. Dist. LEXIS 166463, at *12 (D.P.R. Dec. 11, 2015) ("In the context of judicial review of the ALJ's decision, plaintiff has the burden of showing specifically how the obesity, in combination with other impairments, limits her ability to a degree inconsistent with the ALJ's RFC determination.  Plaintiff must do more than merely introduce evidence of his obesity; rather, he must specifically show how obesity affects his abilities needed for gainful employment.") (quotation and alterations omitted).

Given that Connor never identified obesity as a condition that contributed to his inability to work, the ALJ's reliance on Dr. McGan's opinion which explicitly took Connor's obesity into account, and Connor's failure to specify how his obesity affected his ability to work, the failure of the ALJ to explicitly discuss Connor's obesity in his decision does not require remand.  See

Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (applying harmless error review and determining that ALJ's failure to mention claimant's obesity did not require remand where claimant did not specify how obesity further impaired his ability to work but merely speculated that his weight made it difficult to stand and work, and because the ALJ adopted limitations suggested by specialists and reviewing doctors aware of claimant's obesity); Wertheim v. Colvin, No. 14-029S, 2014 U.S. Dist. LEXIS 179330, at *21-22 (D.R.I. Nov. 18, 2014) (holding that, although ALJ did not explicitly consider claimant's obesity, it was factored indirectly into ALJ's decision based on ALJ's reliance on doctor's RFC assessment which addressed claimant's obesity, and, further, any error in overtly addressing claimant's obesity was harmless where claimant failed to point to any evidence or medical opinion supporting assertion that obesity caused limitations greater than those already incorporated into ALJ's RFC finding).

B.   Vocational Expert Testimony

At the hearing before the ALJ, the vocational expert testified that a hypothetical individual with the RFC ultimately found by the ALJ could perform the work of a small products assembler, price marker, and sorter.  (Tr. 62).  The Commissioner concedes that the vocational expert erred in testifying that the position of sorter did not entail more than frequent grasping, pinching, or pushing with the hand according to the Department of Occupational Titles (the "DOT"), as the job of sorter as defined in the DOT actually requires constant handling.  (Docket #20 at 11).  Connor asserts that this error entitles him to remand.  (Docket #17-1 at 12-13).

While it is clear that there was an error in the ALJ decision, in order to justify a remand, Connor must show that the error was prejudicial.  See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (holding that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").  Both parties agree that the price marker and assembler

jobs comport with the ALJ's RFC determination.   (Docket #21 at 3).   The vocational expert identified 50,000 small products assembler positions nationally and 400 in Massachusetts and 80,000 price marker positions nationally and 900 in Massachusetts.   (Tr. 62).   Such a number of jobs satisfies the Commissioner's burden at step five to show "significant numbers" of positions that a claimant can perform.   See Custodio v. Astrue, No. 07-11876-MLW, 2010 U.S. Dist. LEXIS 102738, at *12-14 (D. Mass. Sept. 27, 2010) (500 estimated positions in the regional economy significant); Vining v. Astrue, 720 F. Supp. 2d 126, 137 (D. Me. 2010) (finding that 11,000 positions nationwide is a "significant" number for purposes of the step five analysis) (citing cases); 20 C.F.R. § 404.1560(c).   Hence, Connor was not prejudiced by the ALJ's reliance on the flawed testimony of the vocational expert regarding the position of sorter and remand is not appropriate on this basis.[6]

## C.      Credibility Determination

Connor argues that the ALJ erred by failing to properly consider his subjective complaints, and that this error resulted in a flawed RFC.   (Docket #17-1 at 13-17).   The ALJ found that Connor's  medically  determinable  impairments  could  reasonably  be  expected  to  cause  the

---

[6] The two cases cited by Connor in support of his position do not command a different conclusion.  In Slovak v. Barnhart, the court remanded the case due to the ALJ's failure to explore the conflict between the testimony of the vocational expert and the DOT.   Slovak v. Barnhart, No. 02-231-M, 2003 U.S. Dist. LEXIS 8971, at *20 (D.N.H. May 29, 2003).   However, in that case, unlike here, the vocational expert's testimony conflicted with the DOT with respect to every position that the vocational expert identified.   Id.   Reece v. Apfel, is more analogous to the facts presented here.   In that case, the vocational expert identified three positions that a hypothetical individual with the RFC the ALJ ultimately determined that claimant possessed could perform.   Reece v. Apfel, 92 F. Supp. 2d 1174, 1178 (D. Kan. 2000).   The ALJ then concluded, based on the vocational expert's testimony, that there were a significant number of jobs in the national and local economy that the claimant was capable of performing.   Id. at 1179. On appeal, the district court determined that two of the positions identified by the vocational expert did not take into consideration all of the claimant's physical restrictions.   Id. at 1182.   Finding that it was unclear whether the ALJ would still conclude that there were a significant number of jobs that the claimant was capable of performing if these two positions were eliminated from consideration, the court remanded the case for the ALJ to consult a vocational expert on the question.   Id. at 1183. However, in Reece, the court never identifies the number of jobs that were available either locally or nationally in each category of employment.   It is unclear whether the number of positions in the category of employment that correctly corresponded with all of the claimant's limitations would have been of a significant number on their own to satisfy the Commissioner's burden at step five.   Here it is clear that there are a significant number of jobs available to Connor if the position of sorter is eliminated from consideration.

symptoms alleged by Connor, but Connor's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they conflicted with the RFC. (Tr. 28).

An ALJ makes a proper credibility determination when such a determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he considered in determining to disbelieve the applicant." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). If the ALJ finds that a claimant's allegations of disability are not credible, the ALJ must gather "detailed descriptions of claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors." Baez Velez v. Sec'y of Health & Human Servs., No. 92-2438, 1993 U.S. App. LEXIS. 12427, at *18-19 (1st Cir. May 27, 1993) (per curiam). Known as the "Avery factors," these descriptions must be carefully considered by the ALJ before he declares the claimant not to be credible. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

The ALJ advanced three reasons, which touch on the Avery factors, for finding that Connor was not credible. First, the ALJ found that:

> the medical evidence of record fails to provide objective support for the claimant's allegations of debilitating neuropathy. The claimant's gait has remained normal and he has required no assistive device for ambulation. Furthermore, the claimant reported a six-to-seven year history of numbness in the feet and arms and was able to work with this condition. The record suggest the claimant stopped working due to becoming upset with a change in his position at work (leading to stress and suicide attempt), rather than leaving due to his physical condition.

(Tr. 28).   Connor states that the medical record is replete with evidence to support his allegations of chronic pain and debilitating effects and, hence, the ALJ's credibility determination is not supported by substantial evidence.   (Docket #17-1 at 16).   Contrary to Connor's assertions, the record adequately supports the ALJ's findings.   The ALJ gave considerable weight to Dr. McGan's opinion which found Connor capable of performing light exertional work with many of the same limitations ultimately incorporated by the ALJ.   (Tr. 29, 86-88).   In his decision, the ALJ accurately recounted Connor's course of treatment, highlighting Dr. Sundar's statement on June 21, 2012 that "[Connor's] pain appears to be out of proportion to [the] rest of the symptoms."   (Tr. 30, 858). While there is record evidence that provides support for Connor's complaints, the responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the ALJ, and the court will not reweigh the evidence where, as here, substantial evidence supports the ALJ's credibility determination.   Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

In finding Connor not credible, the ALJ also relied on the fact that "[Connor] testified to being able to sit comfortably for about 10 minutes, but showed no signs of distress during the hearing, which lasted 30 minutes."   (Tr. 28-29).   An ALJ is free to consider any personal observations of the claimant in the overall evaluation of the credibility of the individual's statements.   SSR 96-7p.   Connor, however, argues that the ALJ's observation is without merit as Connor testified that he was experiencing pain at the hearing, and exhibited discomfort by alternating sitting and standing, which the ALJ acknowledged.   (Docket #17-1 at 17).   The undersigned does not agree.   While it is true that Connor testified that he was experiencing pain in both his hands and his feet at the hearing, Connor did not allege that this pain was related to the length of time that he had been sitting as opposed to other factors.   (Tr. 50).   It is also true that the

ALJ observed that Connor had stood up at one point during the hearing.  (Tr. 57).  However, the undersigned agrees with the Commissioner that one instance of standing in a thirty-minute hearing does not reasonably undermine the ALJ's finding of an inconsistency between Connor's testimony that he can only sit comfortably for about ten minutes and the fact that he showed no sign of distress during the thirty-minute hearing.

The last basis of the ALJ's credibility determination was the fact that "the assessed GAF scores and longitudinal record do not reflect debilitating mental limitations."  (Tr. 29).  While Connor claims that the ALJ erred in this finding, the undersigned finds ample support for it in the record.  (Docket #17-1 at 16-17).  Dr. Kissin assigned Connor a GAF score of 65 in December 2011 and Sergeant assigned Connor a GAF score of 70 in March 2012.  (Tr. 631, 799-801).  These scores denote only "some mild" symptoms or functional limitations, indicating that Connor was "generally functioning pretty well."[7]   American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).  The ALJ also recounted the treatment notes which consistently documented abnormal concentration but normal attention span and memory.[8]   (Tr. 828, 830, 831, 833, 835, 836, 838, 840, 845, 847).  The ALJ took Connor's abnormal concentration into account in limiting him to unskilled tasks.  (Tr. 30).  The ALJ also highlighted Dr. Kissin's statement in December 2011 that Connor appeared to need more mood stabilization, "but overall has what appears to be quite adequate and actually positive work-related skills that he should be able to rely on in the future once his mood is more stabilized."  (Tr. 31, 631).

---

[7] While Leveille did assign Connor a GAF score of 45 on March 22, 2012, denoting serious symptoms or a serious impairment of social or occupational functioning, the ALJ supportably discounted this opinion as inconsistent with actual treatment notes and Connor's activities of daily living. (Tr. 31). Connor does not challenge the weight assigned to this opinion.

[8] The undersigned notes that the treatment notes of March 15, 2012 and April 12, 2012 indicate normal memory, consistent with the other treatment notes, but abnormal attention span and normal concentration. (Tr. 833, 835).

Connor also asserts that the ALJ's credibility determination is based on a mischaracterization of his daily activities as it only partially addressed his hearing testimony, and, therefore, is not supported by substantial evidence.  (Docket #17-1 at 14-15).  While the ALJ did not explicitly ground his credibility determination on this basis, (Tr. 28-29), the claimant's daily activities are an Avery factor that must be carefully considered by the ALJ before he declares the claimant not to be credible.  See Avery, 797 F.2d at 23.

In his decision, the ALJ recounted Connor's testimony that he "has a driver's license and is able to drive for errands . . . is independent with self-care tasks like grooming and bathing[,] uses the internet, but has no hobbies."  (Tr. 28).  The ALJ also noted that "[i]n December 2011, [Connor] reported taking care of his yard in the summer and currently keeping the house clean. He confirmed spending time on the computer and attending many doctor's appointments. [Connor] confirmed being able to budget money and drive independently."  (Tr. 26).  However, Connor argues that the ALJ's evaluation of his daily activities, and hence his credibility determination, was flawed because the ALJ placed great reliance on these isolated statements to the exclusion of others.  (Docket #17-1 at 15).  Connor states that the ALJ improperly failed to credit his testimony that he drives on a weekly not daily basis and, if he does drive, he would go to the store "which is close to the house" in addition to his testimony concerning the disabling effect of his neuropathic symptoms when trying to drive.  (Id.).  Connor also states that the ALJ overlooked his testimony that he does not shower two times a week due to the hassle and difficulty involved in the task and that chores around the house take him a long time to complete.[9]  (Id.). Connor asserts that these evidentiary omissions prejudiced him and, therefore, remand is

---

[9] In his brief, Connor states that the ALJ overlooked his statement that there are days he does not shower due to the pain, difficulty, and hassle involved in self-care tasks.  (Docket #17-1 at 15).  However, Connor testified that he does not shower two times a week due to "the difficulty involved is what, it's just the hassle of it basically;" he did not mention pain as a factor.  (Tr. 58).

necessary.  (Docket #21 at 7).  The ALJ, however, "is not required to – nor could he reasonably – discuss every piece of evidence in the record."  <u>Sousa v. Astrue</u>, 783 F. Supp. 2d 226, 234 (D. Mass. 2011); <u>see</u> <u>NLRB v. Beverly Enters.-Mass., Inc.</u>, 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").  While the ALJ did not mention some of Connor's specific limitations, there is no argument that the ALJ's descriptions were erroneous.  Nor were the descriptions cursory.  Thus, remand is not appropriate.

D.      Weight of Medical Opinions

Connor asserts that the ALJ discounted the opinions of Sergeant, his long-time nurse practitioner, without providing adequate reasoning and, therefore, substantial evidence does not support the ALJ's determination.  (Docket #17-1 at 18).

As an initial matter, the Social Security regulations preclude an ALJ from giving controlling weight to opinions from those who are not "acceptable medical sources."  SSR 06-03p ("Only 'acceptable medical sources' can be considered treating sources as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").  Because Sergeant, as a nurse practitioner, is not an "acceptable medical source" under the regulations, her opinions are not entitled to controlling weight.  <u>See</u> 20 C.F.R. 404.1513(d)(1) (defining "other sources"); <u>see also</u>, <u>e.g.</u>, <u>Martinez v. Colvin</u>, No. 13-30124-KPN, 2014 U.S. Dist. LEXIS 102856, at *7 (D. Mass. July 11, 2014) (opinions of nurse practitioner are not entitled to controlling weight because she is not an "acceptable medical sources").  However, Sergeant is an "other source," whose opinion must be appropriately weighted.

An ALJ may not "ignore 'other medical sources' or fail to adequately explain the weight given to such evidence."  <u>Taylor v. Astrue</u>, 899 F. Supp. 2d 83, 88 (D. Mass. 2012).  "Thus,

although 'other medical sources' are not entitled to controlling weight and an administrative law judge is not required to provide 'good reasons' for the weight assigned to such opinions nor consult the factors listed in 20 C.F.R. §§ 416.927(C)(2)-(6) [or 404.1527(c)(2)-(6)], [the ALJ] still must adequately explain his treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence." Id. at 88-89.

Here, the ALJ did "not give significant weight" to the limits identified by Sergeant on December 5, 2011. (Tr. 30). The ALJ noted that, while Sergeant attributed Connor's limitations to low back pain, shoulder pain, and depression, Connor denied any significant back pain or problems at the hearing. (Tr. 30, 50, 817). Hence, the ALJ remarked that the limits in the questionnaire completed by Sergeant are based on a condition which Connor denied produces any significant problems. (Tr. 30). The ALJ also noted that Sergeant indicated that the described symptoms and limitations applied as of 2005, although Connor was able to sustain employment until June 2011. (Tr. 30, 199, 820). The ALJ also observed that, while Sergeant identified significant limits in the questionnaire, giving as an example the need to elevate the legs with prolonged sitting, these limits were not documented in the actual treatment notes. (Tr. 30, 819). Finally, the ALJ points to Sergeant's treatment note of June 7, 2012, in which Sergeant noted that Connor reported that he felt stable and rated his pain as a four out of ten and that he had not been taking his Percocet and had stopped refilling the medication. (Tr. 30, 842). These observations are all supported by the record. Thus, the undersigned finds that the ALJ reasonably accorded no significant weight to Sergeant's opinions, and sufficiently explained the bases for that decision.

IV.     CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Connor's Motion for Order Reversing Decision of Commissioner (Docket #17) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #19) be ALLOWED.[10]


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[10] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).